# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

BALLAD HEALTH, a Tennessee non-profit )
Corporation; MOUNTAIN STATES HEALTH )
ALLIANCE, a Tennessee non-profit public )
benefit corporation; WELLMONT HEALTH )
SYSTEM, a Tennessee non-profit public benefit )
corporation, TAKOMA REGIONAL )
HOSPITAL, INC., a Tennessee non-profit )   Civil Action No.
public benefit corporation; WELLMONT )
HAWKINS COUNTY MEMORIAL )   **COMPLAINT**
HOSPITAL, INC., a Tennessee non-profit )
public benefit corporation; DICKENSON )
COMMUNITY HOSPITAL, INC., a Virginia )
nonstock corporation; JOHNSTON )
MEMORIAL HOSPITAL, INC., a Virginia )
nonstock corporation; and SMYTH COUNTY )
COMMUNITY HOSPITAL, a Virginia )
nonstock corporation, )
           )
              Plaintiffs, )
           )
       v. )
           )
UNITEDHEALTH GROUP, INC., and )
UNITED HEALTHCARE INSURANCE )
COMPANY, )
           )
           Defendants )

Plaintiffs Ballad Health, Mountain States Health Alliance ("Mountain States Health"),

Wellmont Health System ("Wellmont Health"), Takoma Regional Hospital, Inc. ("Takoma

Regional"), Wellmont Hawkins County Memorial Hospital, Inc. ("Hawkins Memorial"),

Dickenson Community Hospital, Inc. ("Dickenson Hospital"), Johnston Memorial Hospital, Inc.

("Johnston Memorial"), and Smyth County Community Hospital ("Smyth County Hospital")

(collectively, "Plaintiffs" or "Ballad Health") file this complaint against Defendants and state as

follows:

1.     Ballad Health alleges that UnitedHealth Group Inc. ("UHG") and its subsidiary United Healthcare Insurance Company ("UHC") have systematically abused and manipulated the taxpayer-funded Medicare Advantage Program, extracting enormous profit at the expense of taxpayers, patients, and the providers needed to provide access to care—particularly in rural and underserved communities. Defendants have damaged Ballad Health more than $65 million over the last five years, with damages continuing to accrue due to Defendants' ongoing behavior. The outgrowth of this abuse is UHC's improper and systematic denials of claims for medically necessary care that Ballad Health provided and continues to provide to the elderly, low-income and otherwise vulnerable patients of Virgina and Tennessee's Appalachian region.

## PARTIES

2.     Plaintiff Ballad Health, a Tennessee non-profit public benefit corporation, currently operates 19 hospitals in Northeast Tennessee and Southwest Virginia. Prior to September 27, 2024, Ballad Health operated 20 hospitals. Ballad Health is headquartered in Johnson City, Tennessee and has its principal place of business located at 400 N State of Franklin Road, Johnson City, Tennessee.

3.     Ballad Health was formed in 2018 with the primary goal of preserving access to hospitals and health care in a predominantly rural region the relative size of New Hampshire. This occurred through the merger of the region's two legacy health systems, Mountain States Health Alliance and Wellmont Health System. Today, Ballad Health serves as the sole member of both Mountain States Health Alliance and Wellmont Health System. The merger was made possible through legislation in Tennessee and Virginia, which was supported and signed into law by the governors of Tennessee and Virgina. The legislation authorized the issuance of a certificate of public advantage (COPA) in Tennessee and a letter authorizing a cooperative agreement in

Virginia. Since its formation in 2018, the State of Tennessee and the Commonwealth of Virginia have found that Ballad Health has complied with the regulatory requirements enumerated in law and, for each year of its existence, has been found to provide a public advantage in Tennessee and Virginia. Compliance with the requirements of the law includes that Ballad Health has complied with provisions related to its contracting with insurers.

4.      The bipartisan support for the authority to create a COPA in Tennessee and a Letter Authorizing a Cooperative Agreement in Virginia in the legislative and executive branches of Virginia and Tennessee, and the resulting creation of Ballad Health, stemmed from the critical healthcare needs of this region. As reported by the State of Tennessee in the COPA, the region served by Ballad Health stands out for disproportional rates of diabetes, heart disease, obesity, substance abuse, and mental illness. The merger was clearly seen by both Tennessee and Virginia as a mechanism for sustaining access to physician and hospital care throughout the rural region at a time when: rural hospitals were closing, and continue to close; physician shortages were particularly chronic in rural regions, and continue to be chronic; and where the elimination of unnecessary duplication of services would create the opportunity to redirect needed financial resources to help mitigate the public health consequences of the disproportionally high prevalence of the conditions described in the COPA.

5.      The population Ballad Health serves is significantly older than the national average, and the 21 counties that comprise its primary service area have median household incomes below both the state and national averages. This means that Ballad Health's payor mix is substantially skewed towards government programs designed to care for the elderly and lower income Americans, with approximately 70% of Ballad Health's inpatients being covered by Medicare or Medicaid.

3

6.     Among Ballad Health's Medicare patients, approximately 72% are enrolled in Medicare Advantage plans. UHC covers far more of those Medicare Advantage patients than any other payor in Ballad Health's primary service area. With such a disproportionally high percentage of patients being covered by government programs (and such a low proportion of patients having commercial insurance), it is critical that the financial resources of this rural health care provider are used effectively.

7.     The Medicare Advantage insurer that accepts taxpayer dollars must keep their end of the bargain and ensure the care is provided and paid for as intended by federal policymakers.

8.     Congress did not intend for insurers to accept taxpayer dollars for the purpose of paying for medically necessary care, only to deploy unseemly mechanisms to avoid paying for that care.

9.     As more fully described herein, such mechanisms employed by UHG and UHC against Ballad include, but are not limited to, systemic denials, unilateral downcoding of services, and extended inpatient stays to avoid patient access to appropriate post-acute care. While some health systems and hospitals may be able to tolerate such behavior due to their more favorable payer mix, rural systems are disproportionally harmed, and so are their patients. Because of the federal government's formula for the reimbursement of care for Medicare beneficiaries, which systemically pays rural hospitals and physicians less than their suburban and urban counterparts, it is even more egregious when an insurer benefits from that particular payment formula and then deploys the behaviors used by UHC to cause even more harm through denials, downcoding, extending inpatient stays and other mechanisms. Importantly, these behaviors do not inure to the benefit of the taxpayers. In fact, every dollar of avoided payment to a hospital or doctor adds to the profit of the insurer. No insurer seems to have perfected this scheme more than UHG and UHC.

4

10.     Plaintiff Mountain States Health is a Tennessee non-profit public benefit corporation headquartered at 400 N State of Franklin Road, Johnson City, Tennessee. Mountain States Health operates and controls eleven of Ballad Health's hospitals in Tennessee and Virginia. As noted previously, Ballad Health is the parent entity of Mountain States Health today.

11.     Plaintiff Wellmont Health is a Tennessee non-profit public benefit corporation headquartered at 400 N State of Franklin Road, Johnson City, Tennessee. Wellmont Health operates and controls eight of Ballad Health's hospitals in Tennessee and Virginia. As noted previously, Ballad Health is also the parent entity of Wellmont Health today.

12.     Plaintiff Takoma Regional is a Tennessee non-profit public benefit corporation headquartered at 303 Med Tech Parkway, Suite 300, Johnson City, Tennessee. Ballad Health is the parent entity of Takoma Regional, via Wellmont Health.

13.     Plaintiff Hawkins Memorial is a Tennessee non-profit public benefit corporation headquartered at 303 Med Tech Parkway, Suite 300, Johnson City, Tennessee. Ballad Health is the parent entity of Hawkins Memorial, via Wellmont Health.

14.     Plaintiff Dickenson Hospital is a Virginia nonstock corporation headquartered at 303 Med Tech Parkway, Suite 300, Johnson City, Tennessee. Ballad Health is the parent entity of Dickenson Hospital, via Wellmont Health.

15.     Plaintiff Johnston Memorial is a Virginia nonstock corporation headquartered at 400 N State of Franklin Road, Johnson City, Tennessee. Ballad Health is the parent entity of Johnson Memorial, via Mountain States Health.

16.     Plaintiff Smyth County Hospital is a Virginia non-profit public benefit corporation headquartered at 303 Med Tech Parkway, Suite 300, Johnson City, Tennessee. Ballad Health is the parent entity of Smyth County, via Mountain States Health.

17.     Defendant UHG is a Delaware corporation, headquartered at 9800 Health Care Lane, Minnetonka, Minnesota. UHG is the largest health insurance company in the world. It has more than 400,000 employees and insures more than 45 million people worldwide. It is currently ranked third on the Fortune 500 list, with more than $400 billion in revenue.

18.     Defendant UHC is a corporation existing under the laws of the State of Connecticut, with its principal place of business located at 185 Asylum Street, Hartford, Connecticut. UHC, through its subsidiaries and affiliated companies, provides Medicare Advantage insurance plans and contracts with healthcare providers for medical services. UHC falls within the control of UnitedHealthcare, Inc. which is the health insurance division and a primary brand of UHG.

19.     UHG and UHC are collectively referred to herein as "United."

20.     United has been embroiled in a legion of major legal controversies and investigations throughout the United States, and it has been penalized by various courts and/or agencies for misconduct.

21.     Recently, in *Commonwealth of Massachusetts v. The Mega Life Insurance Company and Others*, Civil Action. No. 0684cv04411-BLS1 (Sup. Ct. of Massachusetts), "[t]hree health insurance companies affiliated with UnitedHealthcare have been ordered to pay $165 million in fines and restitution for deceptive marketing practices in what is believed to be the largest total civil penalty brought against a company by the state of Massachusetts."[1]

22.     A class action lawsuit, *Estate of Gene B. Lokken et al. v. UnitedHealth Group, Inc.*, District of Minnesota, Case No. Case No. 23-cv-3514, alleges that UnitedHealth Group and

---

[1]     *See* Doug Bailey, *3 UnitedHealthcare affiliates ordered to pay $165M in Mass. lawsuit*, Insurance Newsnet (Jan. 8, 2025), https://insurancenewsnet.com/innarticle/3-unitedhealthcare-affiliates-ordered-to-pay-165m-in-mass-lawsuit.

another of its subsidiaries, naviHealth, use the "nH Predict algorithm" to wrongfully deny or prematurely cut off coverage for post-acute care for elderly Medicare Advantage patients.

23.     At issue in the *Lokken* class action lawsuit is United's use of its proprietary "nH Predict algorithm" to systematically deny claims, overriding the recommendations of treating physicians. (This is not to be confused with UnitedHealth Group and its subsidiary Ingenix's $50 million settlement with the State of New York and the American Medical Association in 2011 which related to United's intentional misuse of its proprietary database to systematically deny medical claims and United's payments of hundreds of millions in settlements to affected medical providers.)

24.     In February 2025, United States District Judge John R. Tunheim denied United's motion to dismiss the breach of contract and breach of implied covenant of good faith claims asserted in the *Lokken* class action. Judge Tunheim rejected United's argument that plaintiffs had not exhausted all administrative remedies, noting that the appeals process would be "futile" because plaintiffs alleged that they are "perpetually stuck in a loop of denial, appeal, denial until eventually they give up."

25.     Following the suit and the alleged premature denial of coverage for post-acute care *to elderly Medicare Advantage patients*, a United States Senate subcommittee report in 2024 revealed that United was denying post-hospitalization care at a significantly higher rate than its competitors, a practice that accelerated with its use of AI technology.

26.     Defendants' unlawful pattern of conduct targeting and damaging nonprofit health systems is the latest outgrowth of Defendants' knowing and intentional abuse of the Medicare Advantage Program and relevant to United's intentional conduct targeting Ballad Health.

## JURISDICTION AND VENUE

27.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves federal Medicare statutes and regulations governing Medicare Advantage plans, including but not limited to 42 U.S.C. § 1395w-21 *et seq.* and related federal regulations.

28.      Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

29.      This Court has personal jurisdiction over Defendants because Defendants conduct substantial business activities within this judicial district, including advertising its products, contracting with healthcare providers, maintaining Medicare Advantage plan networks, and serving plan members residing in this district.

30.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because: (a) a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, including the performance of medical services, submission of claims, and Defendants' improper denials and payment failures; and/or (b) Defendants are subject to the Court's personal jurisdiction with respect to this action.

## UNITED'S FRAUDULENT MEDICARE ADVANTAGE SCHEMES

31.      United systematically abuses and manipulates the Medicare Advantage Program for its direct economic benefit and to the substantial detriment of patients, healthcare providers, and the American taxpayer. As set forth in this Complaint, Ballad Health is a direct victim of United's systematic abuse and unlawful manipulation.

32.      United uses three related schemes to carry out its abusive policies and practices.

33.     The first scheme involves systematic "upcoding," where United manipulates patients' diagnoses to maximize its profits from the United States government. United uses specialized nurses and unreliable diagnostic devices, employs offshore coders in India to find additional billable conditions, and requires its network of 90,000 physicians to use charting software that forces consideration of additional diagnoses only for Medicare Advantage patients. This manipulation is extraordinarily effective in that patients who switch from traditional Medicare to United Medicare Advantage see their sickness scores increase by 55% in the first year. In 2021 alone, United collected $8.7 billion for diagnoses that no doctor treated.[2] That $8.7 billion represented over 50% of the company's net income for the year.

34.     The second scheme exploits the "Optum loophole" to circumvent the Medical Loss Ratio requirements in the Affordable Care Act ("ACA").

35.     Shortly after the ACA's enactment in 2011, United created Optum Health as a healthcare provider segment, allowing the company to "hire itself" to provide medical care to members.

36.     Independent analysis shows United pays its own Optum provider groups 22% more than competitors, like Blue Cross Blue Shield, pay for identical services, effectively moving insurance profits into the "medical expenses" category to meet medical loss ratio ("MLR") requirements while maintaining outsized profits.[3] This vertical integration strategy has driven a

---

[2]     Christopher Weaver et al., *Insurers Pocketed $50 Billion from Medicare for Diseases No Doctor Treated*, Wall St. J. (July 8, 2024, 12:08 AM), https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d.

[3]     Bob Herman et al., *UnitedHealth pays its own physician groups considerably more than others, driving up consumer costs and its profits*, STAT (Nov. 25, 2024), https://www.statnews.com/2024/11/25/unitedhealth-higher-payments-optum-providers-converts-expenses-to-profits/.

$60 billion acquisition spree over the past decade. Today, Optum is the largest employer of physicians in America and has fundamentally transformed the healthcare industry through what experts describe as sophisticated financial engineering to evade regulatory constraints.

37.     The third scheme involves systematically and grossly delaying and underpaying medical providers, like nonprofit health system Ballad Health, which provide care to Medicare Advantage enrollees and others who are United's insureds.

### A.     Overview of the Medicare Advantage Program

38.     Medicare Advantage ("MA"), or Medicare Part C, allows private insurers like United to provide government-funded insurance to Americans. Under this capitated payment system, CMS pays insurers a flat rate for each member, with risk adjustments that increase payments for sicker patients. This risk adjustment system requires insurers to submit diagnosis codes to CMS, which then calculates "risk scores" that determine payment levels. Higher risk scores mean higher payments—for example, adding metastatic cancer and leukemia diagnoses could increase payments by $20,700 per member annually.

39.     The payment process is prospective, with risk scores calculated each year based on diagnosis codes from the preceding year.

40.     CMS relies on insurers and their contracted providers to accurately document and submit these codes, requiring annual attestations about their validity.

41.     Insurers can use Health Risk Assessments ("HRAs") and chart reviews to identify additional diagnoses that may generate higher payments.

### B.     United's Upcoding Schemes

42.     Over the last few years, United has implemented several schemes to manipulate its risk adjustment scores and extract additional taxpayer money from the federal government.

10

43.     One vehicle for this upcoding scheme is the HouseCalls program. Under this arrangement, United dispatches nurse practitioners to members' homes for 45-60 minute visits ostensibly to identify "gaps in care." United incentivizes MA participants to participate in the HouseCalls program with gift cards and other rewards.

44.     United equipped HouseCalls nurses with company-issued laptops containing pre-loaded software specifically designed to maximize diagnoses for additional payment. Rather than serving as neutral assessment tools, this software suggested potential diagnoses based on members' medications and responses, pushing nurses toward adding as many lucrative medical conditions as possible. The software was calibrated to ensure nurses followed predetermined paths designed to inflate risk scores.[4]

45.     United also employed "quality assurance" teams that systematically reviewed HouseCalls questionnaires to ensure nurses had maximized all available high-value diagnosis codes. If codes were missed, reviewers pressured the HouseCalls nurses to add them through repeated follow-up messages. Nurses were required to respond to these inquiries outside regular work hours and faced termination for non-compliance.

46.     United also required HouseCalls nurses to use the QuantaFlo device to diagnose peripheral artery disease, despite the U.S. Food and Drug Administration's explicit statement that it should not be used as a standalone diagnostic tool.[5] The device was notoriously unreliable and

---

[4]     *See* Christopher Weaver et al., *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated*, Wall St. J. (July 8, 2024, 12:08 AM), https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d.

[5]     Anna Wilde Mathews et al., *The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare*, Wall St. J. (Aug. 4, 2024, 9:00 PM),

prone to false positives, with studies showing 10% false positive rates. Medical experts noted this level of imprecision made it problematic for widespread screening.

47. Despite physician concerns and patient confusion over false diagnoses, United forced HouseCalls nurses to continue the use of the device because each peripheral artery disease diagnosis generated more than $2,500 in additional annual payments. Between 2019–2021, United diagnosed this condition 568,000 times after in-home visits, yielding $1.4 billion in payments compared to only $446 million for all other insurers combined.[6]

48. Beyond HouseCalls, United employed risk-adjustment coders, often based offshore in India, to conduct retrospective chart reviews seeking evidence of undocumented conditions. These coders were evaluated based on how much upcoding they performed and were instructed to "lead" providers toward the highest-value diagnosis codes possible.

49. United also leveraged its network of 90,000 physicians, requiring them to use charting software that recommended various diagnoses for Medicare Advantage patients. The software would not allow doctors to close patient charts without selecting "yes" or "no" for each suggested diagnosis. Significantly, this mandatory consideration of additional diagnoses did not apply to non-Medicare Advantage patients, where higher risk scores provided no financial benefit.[7]

---

https://www.wsj.com/health/healthcare/medicare-extra-payments-home-visits-diagnosis-057dca8b.

[6]    *Id.*

[7]    *See* Christopher Weaver et al., *UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare*, Wall St. J. (Dec. 29, 2024, 9:00 PM), https://www.wsj.com/health/healthcare/unitedhealth-medicare-payments-doctors-c2a343db.

50.     United's efforts to manipulate physician documentation practices designed to increase Medicare payments have been publicly documented to include substantial financial incentives, including thousands of dollars in bonuses, and even gift cards provided to patients in order to entice them to participate in the visits leading to the enhanced documentation.

51.     It has been reported, based on multiple sources, that United uses its control over its doctors to make those patients look as sick as possible on paper relying on a variety of tactics, including money, peer pressure and guilt. Physicians received pressure to code patients for certain conditions, including some that the doctors did not think applied.

52.     While many physicians have spoken under condition of anonymity due to fear of reprisals from UHG, at least one physician whose practice had been acquired by a UHG subsidiary said, "[w]e were not truly caring for patients anymore . . . . We were just micromanaging their care to bring in more money. It just felt so unconscionable." One health care expert said, "[c]ontrolling the physicians is incredibly lucrative for maximizing risk-coding payments…This is the singular explanation why insurance companies are getting into the business of care delivery, particularly of primary care."[8]

53.     The upcoding scheme's effectiveness is evident in United's dramatically inflated diagnosis rates compared to traditional Medicare. United's own 2022 physician research showed the company coded Medicare Advantage members as having lung disorders, vascular conditions, and kidney disease at rates 200% higher than traditional Medicare patients.[9]

---

[8]     Bob Herman et al., *How UnitedHealth harnesses its physician empire to squeeze profits out of* patients, STAT (July 25, 2024), https://www.statnews.com/2024/07/25/united-health-group-medicare-advantage-strategy-doctor-clinic-acquisitions/.

[9]     *Id.*

54.     United doctors diagnosed conditions far more frequently for United Medicare Advantage patients than for patients on competing plans or traditional Medicare, demonstrating the targeted nature of the upcoding scheme.

55.     The financial scale of United's upcoding scheme was massive. A *Wall Street Journal* analysis showed that in 2021 alone, United collected $8.7 billion in taxpayer money for diagnoses that no doctor treated—an amount equal to more than 50% of the company's net income that year.[10] United's average payment per in-home visit was $2,735, far exceeding that of other insurers, with 60% of in-home visits generating at least one new revenue-producing diagnosis of an untreated medical condition.

56.     Patients switching from traditional Medicare to United Medicare Advantage saw their sickness scores increase by 55% in the first year alone equivalent to every patient being diagnosed with HIV and breast cancer simultaneously. This dramatic score inflation demonstrates the systematic and pervasive nature of the upcoding scheme.

57.     A September 2021 OIG report found that United "stood out from its peers" in using chart reviews and health risk assessments to drive risk-adjusted payments. Despite enrolling only 22% of Medicare Advantage members, United received 40% ($3.7 billion) of all questionable payments identified by the OIG. The disproportion was even more stark for in-home assessments, where United captured 58% ($1.5 billion) of all such payments.[11]

---

[10]     Christopher Weaver et al., *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated*, Wall St. J. (July 8, 2024, 12:08 AM), https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d.

[11]     Suzanne Murrin, *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments*, U.S. Dep't of Health & Hum. Servs. Off. of Inspector Gen. 10-11 (2021).

58.     A more recent OIG report, from October 2024, demonstrated that United's practices had continued and intensified. In 2023, United received $3.5 billion (two-thirds) of the $4.8 billion in risk-adjusted payments made for diagnoses reported only on in-home HRAs and related chart reviews, while covering only 28% of Medicare Advantage members.[12]

59.     A comprehensive study published in the Annals of Internal Medicine provided the first detailed comparison of extra revenue from Medicare Advantage coding among individual insurers. The research showed Medicare Advantage insurers pulled in an estimated $33 billion in additional government payments in 2021 from diagnoses that made members appear sicker relative to traditional Medicare patients. United captured $13 billion of this total—42% of all such payments—despite being just one company among many insurers.[13]

60.     The study's lead author noted that "United is just coding a lot more than the other largest insurers," with coding differences concentrated within 10 diagnostic groups including vascular disease, major depressive disorder, and drug and alcohol dependence. The research confirmed that roughly half of the inflated diagnoses came from chart reviews and health risk assessments, with United leading in both categories.

---

https://oig.hhs.gov/documents/evaluation/2794/OEI-03-17-00474-Complete%20Report.pdf.

[12]     *Medicare Advantage: Questionable Use of Health Risk Assessments Continues to Drive Up Payments to Plans by Billions*, U.S. Dep't of Health & Hum. Servs. Off. of Inspector Gen. (Oct. 2024), https://oig.hhs.gov/documents/evaluation/10028/OEI-03-23-00380.pdf.

[13]     Tara Bannow, *Study shows how UnitedHealth uses coding to rake in extra cash from Medicare Advantage*, STAT (Apr. 7, 2025), https://www.statnews.com/2025/04/07/medicare-advantage-study-risk-adjustment-coding-unitedhealth/.

C. United's Exploitation of the "Optum Loophole"

61.     When the ACA was passed in 2010, it introduced MLR requirements, which require insurance companies to spend a certain portion of the premiums they receive from patients on actual patient care, rather than administrative costs and profit. Specifically, large group plans have an MLR of 85%, and smaller group plans have an MLR of 80%. MA Plans are also subject to the ACA limits and have an MLR of 85%.

62.     Recognizing the threat that the MLR requirements posed to its traditional profit margins, United immediately began strategically maneuvering to avoid the negative financial impact. In April 2011, shortly after the enactment of the ACA, United created Optum Health to house its non-insurance businesses. This wasn't merely organizational restructuring. Instead, it was a calculated scheme to circumvent the ACA's profit limitations.

63.     United recognized that creating Optum Health, the healthcare provider segment, allowed the Company to blur the lines between its payer and provider businesses, evading the constraints of the ACA's MLR rules. The scheme was elegantly simple: United could simply hire its own affiliate—via Optum Health—to provide medical care to members. Thus, United could increase payments to Optum Health to hit the minimum MLR level and pocket outsized profits the ACA was designed to eliminate.

64.     Healthcare economists quickly recognized the anti-competitive implications of United's vertical integration strategy. Christopher Whaley, a health-care economist at Brown University, explained that Optum Health allowed United to "acquire providers and essentially pay

[it]self" and expressed concern that the arrangement "provides a disincentive to really care that much about prices and spending growth."[14]

65.     STAT News conducted a comprehensive analysis published on November 25, 2024, titled "United pays its own physician groups considerably more than others, driving up consumer costs and its profits." Healthcare consultant Ron Howrigon, a former executive at Blue Cross Blue Shield, Cigna Healthcare, and Kaiser Permanente, stated that United was "cooking the books…by pushing things that are really insurance company profit over to medical expenses, because you own those doctors." A physician from an Optum Health New York practice noted the artificial nature of these transactions: "It's really a game the way they switch money from their right pocket to their left."[15]

66.     United's attempts to exploit the MLR also led to an unprecedented acquisition spree that fundamentally transformed the healthcare industry. Soon after the enactment of the ACA, United accelerated Optum Health's expansion and United's vertical expansion in the provider space. The scale of this expansion was staggering: Over the last decade, United has spent $60 billion on acquisitions. Through these acquisitions, Optum Health has become the largest employer of physicians in America, boasting relationships with 90,000 physicians across the country, or 10% of all physicians in America.

---

[14]     Dan Diamond et al., *UnitedHealth grew very big. Now, some lawmakers want to chop it down*, The Wash. Post (May 2, 2024), https://www.washingtonpost.com/health/2024/04/30/unitedhealth-congress-review-cyberattack/.

[15]     Bob Herman et al., *UnitedHealth pays its own physician groups considerably more than others, driving up consumer costs and its profits*, STAT (Nov. 25, 2024), https://www.statnews.com/2024/11/25/unitedhealth-higher-payments-optum-providers-converts-expenses-to-profits/.

67. United's vertical integration strategy through sophisticated financial engineering enabled it to circumvent ACA restrictions. As part of United's scheme to shift more dollars to Optum to avoid the profit limitations imposed by the MLR rules, United paid its Optum provider groups more than non-Optum providers.

68. STAT News analyzed the extent of United's self-dealing. The analysis focused on five common medical procedures that allow for flexible rates paid to providers and account for a large percentage of medical spend. The report analyzed more than 94 million rows of data from United and compared them with similar data from Blue Cross Blue Shield ("BCBS"). The results were striking. STAT News reported that, on average, United paid Optum Health providers 22% more than BCBS paid for the same services.[16]

69. United's acquisition spree has not slowed down. In fact, in August 2025 Optum announced that it has acquired 200-provider Holston Medical Group, which has more than 70 locations in Northeast Tennessee and Southwest Virginia.

## UNITED'S MEDICAL PROVIDER UNDERPAYMENT SCHEMES

70. At the same time United is unscrupulously defrauding the government by the upcoding schemes described above, United has been engaging in improper and unlawful conduct aimed at maximizing its profits at the expense of patients and physicians. For example,

    a. In 2009, United agreed to pay $350 million to patients and physicians to settle claims that it systematically underpaid "usual and customary" charges.[17]

---

[16] *Id.*

[17] *See UnitedHealth will pay $350M to settle AMA class-action over Ingenix data*, Fierce Healthcare (Jan. 15, 2009, 1:34 PM), https://www.fiercehealthcare.com/healthcare/unitedhealth-will-pay-350m-to-settle-ama-class-action-over-ingenix-data.

b.      In May 2015, United agreed to pay $11.5 million to settle claims relating to its scheme to deprive providers in North Carolina, Tennessee, Connecticut, and New York millions in reimbursement using software and other processes aimed to reduce, deny, and impede claims.[18]

c.      In September 2015, United agreed to pay $9.5 million to settle claims alleging that it systematically underpaid California medical providers.[19]

d.      In March 2023, an arbitration panel issued a $91.2 million arbitration award against United for the underpayment of medical services between 2017 and 2018, finding that United had breached its contract by unilaterally reducing payments to clinicians.[20]

71.     Recently, United was sued in Nevada state court, alleging United had wrongfully underpaid for emergency medical treatment.

72.     In November 2021, a Clark County, Nevada jury unanimously found that United had unjustly enriched itself at the clinician's expense.

73.     That jury found by clear and convincing evidence that United had engaged in a scheme of "oppression, fraud, or malice" and that United's conduct constituted an unfair claims settlement practice under Nevada law.

74.     In addition to compensatory damages, the Clark County jury found United and its affiliates liable for $60 million in punitive damages.

---

[18]     Dina Overland, *UnitedHealth agrees to $11.5M settlement over claims payment*, Fierce Healthcare (May 6, 2015, 12:42 AM), https://www.fiercehealthcare.com/payer/unitedhealth-agrees-to-11-5m-settlement-over-claims-payment.

[19]     Y. Peter Kang, *United Health To Pay $9.5M in Insurance Underpayment Row*, Law360 (Sept. 10, 2015, 9:03 PM), https://www.law360.com/articles/701596/unitedhealth-to-pay-9-5m-in-insurance-underpayment-row.

[20]     Sydney Halleman, *Envision Wins $91M in arbitration against UnitedHealthcare*, Healthcare Dive (May 3, 2023), https://www.healthcaredive.com/news/envision-wins-arbitration-against- unitedhealthcare/649277/.

75.     Even more recently, in 2025, United subsidiary UMR, Inc. paid $20.25 million dollars to settle allegations by the United States Department of Labor that the company wrongly denied thousands of claims to pay health care providers for emergency room services and urinary drug screenings.[21] Regarding emergency claims, which are also at issue in this litigation, the Department of Labor alleged that UMR had denied emergency claims based solely on diagnosis codes and not applying a prudent layperson standard.[22]

76.     The pattern and conduct of behavior set forth above extended to Ballad Health.

## UNITED'S SCHEME EXTENDS TO BALLAD HEALTH'S CARE FOR MEDICARE ADVANTAGE PATIENTS

### A.     Mountain States Agreement

77.     On or about August 15, 2010, Mountain States Health and United entered into a Facility Participation Agreement ("Mountain States Agreement") whereby Mountain States Health, on behalf of its hospital affiliates, agreed to provide medical services to United's members. The Mountain States Agreement has been amended multiple times since 2010. The Mountain States Agreement is not being filed herewith due to confidentiality obligations. Plaintiffs will seek leave to file it under seal. However a courtesy copy, with relevant Amendments, will be served on Defendants with the Summons and Complaint.

78.     Dickenson Hospital, Johnston Memorial, and Smyth County Hospital are listed as facilities in the Mountain States Agreement and are subject to the terms and conditions of that Agreement.

---

[21]    Kellie Mejdrich, *UnitedHealth Unit Inks $20M Deal To End DOL Claims Row*, Law360 (Feb. 10, 2025, 5:21 PM), https://www.law360.com/articles/2296000/unitedhealth-unit-inks-20m-deal-to-end-dol-claims-row.

[22]    Complaint, *Su. v. UMR, Inc.*, No. 3:23-cv-00513 (W.D. Wis. July 31, 2023), ECF No. 1.

79.     The Mountain States Agreement governs the terms and conditions under which Mountain States Health through its hospital affiliates provides medical services to United's plan members and the corresponding payment obligations of United.

80.     Mountain States Health has at all relevant times performed its obligations under the Mountain States Agreement by its hospital affiliates providing medically necessary services to United's plan members in accordance with applicable standards of care and the terms of the Mountain States Agreement.

81.     The Mountain States Agreement obligates United to pay Mountain States Health for covered services according to specified terms and timelines.

82.     The Mountain States Agreement contains an arbitration provision that requires disputes to be resolved through binding arbitration rather than in court proceedings.

83.     Since at least 2020, United has engaged in a pattern and practice of improperly denying claims, delaying payments, and failing to comply with its payment obligations under the Mountain States Agreement.

84.     United has systematically and excessively denied medical necessity determinations for emergency room admissions at Mountain States Health facilities, including cases where such admissions were medically necessary and appropriate under applicable medical standards and Medicare guidelines.

85.     United's conduct including its breach of the Mountain States Agreement has caused significant financial harm and damage to Ballad Health, more than $60 million, and has interfered with Ballad Health's ability to provide necessary medical care to patients.

**B.     Wellmont Health Agreement**

86.     On or about June 19, 2014, Wellmont Health and United entered into a Facility

Participation Agreement ("Wellmont Health Agreement") whereby Wellmont Health, on behalf of its hospital affiliates, agreed to provide medical services to United's members. The Wellmont Health Agreement has been amended multiple times since 2014. The Wellmont Health Agreement is not being filed herewith due to confidentiality obligations. Plaintiffs will seek leave to file it under seal. However a courtesy copy, with relevant Amendments, will be served on Defendants with the Summons and Complaint.

87.     Hawkins Memorial was included as a Wellmont facility in the Wellmont Health Agreement and is subject to the terms and conditions of that Agreement.

88.     Takoma Reginal was added to the Wellmont Health Agreement effective August 1, 2017, and is subject to the terms and conditions of that Agreement.

89.     The Wellmont Health Agreement governs the terms and conditions under which Wellmont Health through its hospital affiliates provides medical services to United's plan members and the corresponding payment obligations of United.

90.     Wellmont Health has at all relevant times performed its obligations under the Wellmont Health Agreement by its hospital affiliates providing medically necessary services to United's plan members in accordance with applicable standards of care and the terms of the Wellmont Health Agreement.

91.     The Wellmont Health Agreement obligates United to pay Wellmont Health for covered services according to specified terms and timelines.

92.     The Wellmont Health Agreement contains an arbitration provision that requires disputes to be resolved through binding arbitration rather than in court proceedings.

93.     Since at least 2020, United has engaged in a pattern and practice of improperly denying claims, delaying payments, and failing to comply with its payment obligations under the Wellmont Health Agreement.

94.     United has systematically and excessively denied medical necessity determinations for emergency room admissions at Wellmont Health hospital facilities, including cases where such admissions were clearly medically necessary and appropriate under applicable medical standards and Medicare guidelines.

95.     United's conduct including its breach of the Wellmont Health Agreement has caused significant financial damage to Ballad Health, more than $60 million, and has interfered with Ballad Health's ability to provide necessary medical care to patients.

96.     The Mountain States Agreement and the Wellmont Health Agreement are collectively referred to herein as the "UHC Agreements."

97.     At the time that United entered the UHC Agreements, as amended, United had the presently existing state of mind and intent not to honor its obligations. Instead, United expressly intended to deprive Ballad Health of the benefit of its bargain and cause damage to Ballad Health consistent with United's overall pattern of conduct and scheme described herein.

98.     The UHC Agreements also contain unlawful arbitration provisions that are contrary to public policy and are *void ab initio*. These non-negotiable arbitration provisions are aimed to shield Defendants' misconduct from the public eye, avoid judicial and governmental scrutiny of their abuse of the Medicare Advantage Program, and to hide their misconduct which is deleterious to public health.

99.     Further, the UHC Agreements constitute unlawful contracts of adhesion particularly in the context of Medicare Advantage where the population Ballad Health serves is

heavily skewed toward those covered by Medicare Advantage plans, and where United has effectively taken a pool of funds from the federal government in order to administer the Medicare Advantage payments for care rendered to plan subscribers and engaged in a scheme to unlawfully retained such funds for its economic and financial benefit and to the financial detriment and damage of Ballad Health.

100.    A small sample of recent Ballad Health patients treated in the first week of June 2025, and whose claims United baselessly denied on the supposed grounds that treatment was not medically necessary, is illustrative of United's ongoing, systemic, and abusive conduct:

- A 73-year-old woman came to the hospital emergency room with sudden, severe difficulty breathing, nausea, weakness, and a two-pound weight gain over several days. She described a frightening sensation of smothering and had significant chest pain in the front of her chest. She had a serious medical history including heart failure, severe long-term lung problems requiring home oxygen, chronic lung disease, high blood pressure, type 2 diabetes, and a previous blood clot in her leg. She was diagnosed with acute, life-threatening worsening of her heart failure, which was critically complicated by a severely leaking heart valve and significant long-term kidney damage. Because her kidneys were already seriously impaired and she had a sensitivity to contrast dye used in imaging tests, she was not able to have a heart valve repair procedure—limiting her treatment options. She required hospitalization and medical management for this grave condition. Claiming the patient's treatment was not medically necessary, United denied the claim.

- A 69-year-old man with a complex and serious medical history including a chronic pain condition, acid reflux disease, high blood pressure, a prior heart attack, and joint disease was transferred to a hospital for evaluation for a critical heart procedure. He reported that after suffering a heart attack several months earlier, he experienced severe difficulty breathing even after minimal activity like walking. He also reported presenting to his previous facility with serious symptoms including chest pain, weakness, and significant shortness of breath during any physical exertion. The patient underwent an invasive heart imaging procedure through an artery in his wrist, which revealed a critically severe 80-90% hardened blockage in a major heart artery—a dangerous condition requiring urgent intervention. Claiming the patient's treatment was not medically necessary, United denied the claim.

- An 88-year-old woman with a complex and extremely serious medical history including chronic heart disease, persistent irregular heartbeat, high blood pressure, hardening of the heart's blood vessels, high cholesterol, and long-term low blood count presented to the hospital for scheduled hip surgery. She had multiple previous hospitalizations for serious conditions including shortness of breath, chest pain, difficulty swallowing, new irregular heartbeat episodes, bleeding in the lungs, dizziness, severe high blood pressure, sporadic irregular heartbeat episodes, sudden critical worsening of her chronic heart condition, and a mild heart attack. She was admitted for inpatient treatment with her primary diagnosis being severe arthritis of the right hip, requiring hospitalization due to her numerous serious health conditions, advanced age, and elevated surgical risk. Claiming the patient's treatment was not medically necessary, United denied the claim.

**C.     Bed Day Payments**

101.    On August 8, 2024, United and Ballad Health executed several Facility Medicare Advantage Payment Appendices ("2024 Appendices") to the Mountain States Agreement and the Wellmont Health Agreement, effective September 1, 2024. The 2024 Appendices are not being filed herewith due to confidentiality obligations. Plaintiffs will seek leave to file it under seal. However a courtesy copy will be served on Defendants with the Summons and Complaint.

102.    The 2024 Appendices required United to, *inter alia*, pay Ballad Health a *per diem* rate for United Medicare Advantage patients who were in the hospital for longer than anticipated based on their diagnosis ("Bed Day Payments"). Ballad Health sought the Bed Day Payments when the 2024 Appendices were negotiated because of United's practice of delaying and/or denying approval for post-acute care for patients who no longer needed inpatient hospital care. This practice led to longer lengths of stay in the hospital—which presented unnecessary risks to patients and unreimbursed costs to the hospital. Unnecessarily extending hospital stays also has the cascade effect of lengthening emergency room wait times for other patients who need admission to the hospital. Thus, this practice by United is extremely harmful to the entire system

of care. For this reason, during the negotiations for the 2024 Appendices, United agreed to mitigate some of the harm and excess expenses to the Ballad Health hospitals by compensating the hospital for the unnecessary, extended stays United was causing.

103.    Despite multiple attempts by Ballad Health to collect, United has failed to remit **_any_** Bed Day Payments. As of this filing, United owes Ballad Health more than $7.1 million dollars in Bed Day Payments. Ballad has incurred direct costs related to United's practice, including for contract labor, and has incurred reputational damage resulting from increased wait times for these needed hospital beds. United's conduct in negotiating for the Bed Day Payments to mitigate the delays United was causing for inpatients seeking post-acute care and then intentionally refusing to honor its payment obligations relative thereto is both intentional and malicious and United's actions were in this regard made with deliberate indifference to its contractual obligations to Ballad Health, the result of which has been substantially detrimental to the financial interest of Ballad Health and its hospital facilities.

104.    At the time that United entered the 2024 Appendices, United had the presently existing state of mind and intent not to honor its obligations. Instead, United expressly intended to deprive Ballad Health of the benefit of its bargain and cause damage to Ballad Health consistent with United's overall pattern of conduct and scheme described herein.

### COUNT I—DECLARATORY JUDGMENT
### (Arbitration Provisions Void as Against Public Policy)

105.    Ballad Health realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

106.    The arbitration provisions contained in the UHC Agreements are void and unenforceable as against public policy.

107.    The arbitration provisions serve to conceal United's improper activities from public view and regulatory oversight, which include, but are not limited to: (a) systematic denial of medically necessary services; (b) improper claim handling practices affecting Medicare Advantage beneficiaries; (c) violations of Medicare Advantage regulations; and (d) practices that compromise patient care and safety.

108.    Public policy strongly favors transparency in healthcare insurance practices, particularly those involving Medicare Advantage plans that serve vulnerable populations and are funded by taxpayer dollars.

109.    The concealment of United's improper activities through mandatory arbitration prevents regulatory oversight, undermines public accountability, and harms the public interest.

110.    The arbitration provisions contravene established public policy by enabling United to engage in conduct that would otherwise be subject to public scrutiny and regulatory enforcement. United's ability to shield its conduct by the confidential nature of arbitration provisions and proceedings is patently offensive to the public good.

111.    Ballad Health, pursuant to 28 U.S.C. § 2201, seeks a declaratory judgment that the arbitration provisions in the UHC Agreements are void and unenforceable as against public policy.

## COUNT II—BREACH OF CONTRACT
### (Excessive Medical Necessity Denials of Emergency Room Admissions)

112.    Ballad Health realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

113.    The UHC Agreements require United to make medical necessity determinations in accordance with applicable medical standards, Medicare guidelines, and reasonable medical judgment.

114. The UHC Agreements prohibit United from engaging in arbitrary, capricious, or excessive denials of medical necessity.

115. Emergency room admissions are subject to specific medical necessity standards that recognize the urgent nature of emergency care, and the clinical judgment required in emergency situations.

116. United has violated and breached the terms of the UHC Agreements by, *inter alia*: (a) excessively denying medical necessity for emergency room admissions; (b) applying inappropriate or overly restrictive criteria for emergency admissions; (c) failing to give proper deference to the clinical judgment of emergency physicians; (d) denying claims for emergency admissions that clearly met applicable medical necessity standards; and (e) using retrospective review processes that inappropriately second-guess emergency medical decisions.

117. United's excessive medical necessity denials constitute material breaches of the UHC Agreements and have: (a) caused financial harm and damage to Ballad Health in excess of $60 million; (b) interfered with the physician-patient relationship; (c) compromised patient care; and (d) created uncertainty and delays in treatment decisions.

118. Ballad Health has suffered compensatory damages of more than $60 million as a direct and proximate result of United's violations, including unpaid claims, administrative costs, and interference with patient care operations.

## COUNT III—BREACH OF CONTRACT
### (Failure to Respond to Appeals in Timely Manner)

119. Ballad Health realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

120. The UHC Agreements contain provisions requiring United to respond to appeals of claim denials within specified timeframes.

121.     Ballad Health has submitted numerous appeals of improperly denied claims in accordance with the procedures set forth in the UHC Agreements.

122.     Ballad Health performed all conditions precedent to United's obligation to respond to appeals in a timely manner, including, without limitation: (a) submitting appeals within the required timeframes; (b) providing all necessary documentation and supporting materials; (c) following the appeal procedures specified in the UHC Agreements; and (d) complying with all formatting and submission requirements.

123.     Despite Ballad Health's compliance with appeal procedures, United has materially breached the UHC Agreements by, *inter alia*: (a) failing to acknowledge receipt of appeals within required timeframes; (b) failing to provide substantive responses to appeals within required timeframes; (c) providing inadequate or incomplete responses to appeals; (d) unreasonably delaying the appeal review process; and (e) failing to provide the detailed explanations required by the UHC Agreements for appeal decisions.

124.     United's failure to respond to appeals in a timely manner has: (a) delayed Ballad Health's receipt of payments that are due and owing; (b) increased Ballad Health's administrative costs and burden; (c) interfered with Ballad Health's cash flow and operations; (d) prevented timely resolution of disputed claims; and (e) forced Ballad Health to carry accounts receivable for extended periods.

125.     As a direct and proximate result of United's breach of its appeal response obligations, Ballad Health has suffered compensatory damages including but not limited to lost interest on delayed payments, increased administrative costs, opportunity costs, and other consequential damages.

## COUNT IV—BREACH OF CONTRACT
### (Failure to Pay for Additional Bed Days)

126.    Ballad Health realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

127.    The September 2024 Medicare Advantage Payment Appendices require United to pay Ballad Health a Per Diem rate for instances where United Medicare Advantage Patients are in the hospital longer than expected.

128.    Ballad Health has performed all conditions precedent to United's obligation to pay under this provision including but not limited to: (a) providing medically necessary services to United's plan members; (b) submitting claims in a timely manner and in accordance with required procedures; (c) providing all necessary documentation and information to support such claims; and (d) complying with all applicable requirements under the UHC Agreements.

129.    Despite Ballad Health's performance of its obligations and repeated demands for payment, United has materially breached this provision by failing to pay the full amounts due under the September 2024 Medicare Advantage Payment Appendices.

130.    As a direct and proximate result of United's breach of its payment obligations together with its malicious and intentional conduct as more specifically described herein, Ballad Health (a) has suffered damages including but not limited to lost interest on delayed payments, increased administrative costs, opportunity costs, and other consequential damages, and (b) is entitled to an award of punitive damages.

## COUNT VI—BREACH OF CONTRACT
### (Breach of the Duty of Good Faith and Fair Dealing)

131.    Ballad Health realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

132.     Under Tennessee law, every contract contains an implied covenant of good faith and fair dealing, which requires each party to refrain from doing anything to injure the right of the other party to receive the benefits of the agreement.

133.     The Agreements between Ballad Health and United contain an implied duty of good faith and fair dealing.

134.     As set forth above, United breached its duty of good faith and fair dealing by:

- Engaging in a pattern and practice of delaying, denying, and underpaying valid claims;

- Imposing unreasonable and burdensome documentation requirements;

- Failing to conduct reasonable investigations of claims before denying them;

- Failing to communicate effectively regarding claim status and denials; and

- Acting in bad faith to avoid its payment obligations under the Agreement.

135.     In addition to United's breach of the duty of good faith and fair dealing, United's conduct was intentional, willful, and in reckless disregard of Ballad Health's rights under the Agreement including its right to payment.

136.     United's breach of the duty of good faith and fair dealing has caused Ballad to suffer substantial damages, including but not limited to economic losses from unpaid claims; increased administrative costs associated with pursuing payment; lost business opportunities; and damage to business relationships.

## COUNT V— FRAUD

137.     Ballad Health realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

138.     United receives federal capitation payments based on its representations that it will provide, manage, and pay for covered services to eligible Medicare beneficiaries consistent with Medicare standards.

139.     United knowingly and intentionally misrepresented to CMS, the State of Tennessee, and participating hospitals that it would administer its plan in compliance with federal law, including requirements to provide coverage for medically necessary care.

140.     At the time United accepted capitation payments and entered into its agreements with Ballad Health, it knew and intended that it would systematically deny or delay legitimate hospital claims for medically necessary care provided to elderly, low-income, and medically fragile Tennesseans and Virginians.

141.     United made these representations to induce the federal and state governments to release funds and to induce hospitals, including Ballad Health, to continue treating United's enrollees under the false premise that claims would be reviewed and paid in good faith.

142.     United's false statements were made deliberately with the intent to mislead Ballad Health. During its negotiations and at the time of entering into its agreements with Ballad Health, United concealed or suppressed material facts regarding United's true intentions as described above; that such intentional concealment or suppression were made with the intent to deceive Ballad Health; that Ballad Health was unaware of such facts and would have acted differently if aware of Untied's true intentions; and Ballad Health was damaged and harmed by Untied's concealment of material facts.

143.     As a direct and proximate result of United's fraudulent behavior and conduct described above, Ballad Health (a) has suffered compensatory damages including but not limited

to lost interest on delayed payments, increased administrative costs, opportunity costs, and other consequential damages, and (b) is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.      Enter a declaratory judgment that the arbitration provisions in the UHC Agreements are void and unenforceable as against public policy;

B.      Find that United has materially breached the UHC Agreements as alleged herein;

C.      Award Ballad Health compensatory damages in an amount to be proven at trial for United's breach of contract and violations of the UHC Agreements;

D.      Award Ballad Health punitive damages in an amount to be proven at trial to compensate Ballad Health for the egregious nature of UHC's conduct;

E.      Award Ballad Health prejudgment and post-judgment interest at the maximum rate allowed by law; and

F.      Award Ballad Health its reasonable attorneys' fees and costs incurred in this action, to the extent permitted by law or contract; and

G.      Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ballad Health hereby demands a trial by jury on all issues so triable.

Dated: October 21, 2025

BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, PC

 s/ Nora A. Koffman
Nora A. Koffman (BPR 038025)
602 Sevier Street, Suite 300
Johnson City, Tennessee 37604
(423) 975-7668 (phone)
nkoffman@bakerdonelson.com

Anthony Argiropoulos, Esq. *(pro hac vice to be filed)*
Thomas Kane *(pro hac vice to be filed)*
William Gibson, Esq. *(pro hac vice to be filed)*
4365 Route 1 South
Suite 301
Princeton, New Jersey 08540
(609) 490-4860
aargiropoulos@bakerdonelson.com
tkane@bakerdonelson.com
wgibson@bakerdonelson.com

*Attorneys for Plaintiffs Ballad Health, Mountain States Health Alliance and Wellmont Health System, Takoma Regional Hospital, Inc., Wellmont Hawkins County Memorial Hospital, Inc., Dickenson Community Hospital, Inc., Johnston Memorial Hospital, Inc., and Smyth County Community Hospital*